**NAS SURETY GROUP, formerly known as North American Specialty Insurance Company, Plaintiff,**

v.

**PRECISION WOOD PRODUCTS, INC., Jeffrey M. Bostian, Dana T. Bostian, and Lumber Mutual Insurance Company, Defendants.**

No. 1:00 CV 01267.

United States District Court, M.D. North Carolina.

July 16, 2003.

James Anthony Penry, Neil A. Riemann, Taylor Penry Rash & Riemann, PLLC, Raleigh, NC, for Plaintiff.

Leanor Deborah Bailey Hodge, Manning Fulton & Skinner, Raleigh, NC, Michael T. Medford, Manning Fulton & Skinner, Raleigh, NC, Dana T. Bostian, Leanor Deborah Bailey Hodge, Michael T. Medford, Robert G. Mciver, Hunter Higgins Miles Elam & Benjamin, PLLC, Greensboro, NC, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHARP, United States Magistrate Judge.

This matter is before the Court on a motion by Plaintiff NAS Surety Group ("NAS") for summary judgment (Pleading No. 25) and a cross-motion by Defendant Lumber Mutual Insurance Company ("Lumber") for summary judgment (Pleading No. 30). The motions have been fully briefed, and the Court heard oral argument from the parties on June 4, 2003. The motions are ready for a ruling.

### I. Procedural History

Plaintiff NAS commenced this action on December 27, 2000, alleging (1) breach of a general agreement of indemnity by Defendants Precision Wood Products, Inc. ("PWP"), Jeffrey M. Bostian, and Dana T. Bostian; and (2) breach of an insurance contract by Defendant Lumber. The Bostians and Lumber filed answers denying the material allegations in the complaint and asserting various affirmative defenses. PWP failed to answer, and the Clerk entered default against PWP on December 11, 2001.[1] On January 8, 2003, the parties mediated their claims and a settlement was reportedly reached between NAS and the Bostians, although no dismissal of claims has been filed to this date. Thus, the parties with active claims in this matter are Plaintiff NAS and Defendant Lumber. As stated above, each party has now moved the Court for summary judgment.

### II. Statement of Facts

In 1993, an extensive renovation and expansion project was planned for the Alamance Regional Medical Center

---

1. Information in the record before the Court suggests that PWP is no longer a going concern. See, e.g., Pleading No. 31, Def.'s Br. in Support of Mot. for Summ. J., John K. Keizer Aff., Ex. B. Despite the entry of default, no motion for a default judgment has been filed. The Court will include an Order with regard to this matter at the conclusion of this Memorandum Opinion and Order.

("ARMC"). ARMC hired Rodgers Builders, Inc. ("Rodgers") to serve as general contractor. Rodgers, in turn, retained Fowler Jones Construction Co. ("Fowler") as the prime contractor responsible for general construction activities on the project. (Pleading No. 31, Def.'s Br. in Support of Mot. for Summ. J., John G. Currin, Jr. Aff. ¶ 3.) Fowler retained Defendant PWP, a South Carolina corporation, as a subcontractor to provide cabinets and millwork on the project. *Id.* ¶ 4. PWP obtained a performance bond from Plaintiff NAS in the amount of $982,300 to cover its work on the ARMC project, naming PWP as principal and Fowler as obligee. *Id.*, Ex. A. In addition, pursuant to its subcontract with Fowler, PWP obtained a comprehensive general liability ("CGL") insurance policy and a blanket excess or "umbrella" policy from Defendant Lumber and named Fowler as an additional insured on both policies. (Pleading No. 31, Thomas Gyscek Aff., Ex. A.) Although not directly relevant to this action, both policies were cancelled in October 1996 due to PWP's failure to pay the premiums. Gyscek Aff. ¶ 3.

PWP supplied the cabinetry and millwork to Fowler and subcontracted the installation of the cabinetry and millwork to Laboratory Services, a company located in Cary, North Carolina. (Pleading No. 35, Gregory G. O'Mahony Decl. ¶ 14, Ex. C.) After the cabinetry and millwork were installed and ARMC took possession of the work, extensive defects were discovered in the cabinetry and millwork furnished by PWP. The problems included delamination of the countertops and inadequate construction of drawers and doors. (Currin Aff. ¶ 5; O'Mahony Decl. ¶ 13.)

As a result of these defects, ARMC made demand on Rodgers and Fowler to correct the cabinetry and millwork problems. Fowler made demand on PWP and its surety, NAS. (O'Mahony Aff. ¶ 16.) NAS undertook an investigation of ARMC's claims and tendered the penal sum of its performance bond. *Id.* ¶ 18. At some point in 1997, PWP placed its CGL carrier, Defendant Lumber, on notice of ARMC's pending claims. On November 13, 1997, Lumber responded to PWP in writing with a "reservation of rights" letter. Lumber took the position that ARMC's losses caused by PWP's defective cabinetry and millwork were excluded from coverage under exclusions "k," "l," "m," and "n" in the CGL policy.[2] (Keizer Aff., Ex. A.) On November 17, 1997, Fowler, an additional insured on PWP's CGL policy, also notified Lumber of ARMC's claims and demanded that Lumber provide a defense. *Id.*, Ex. B. Lumber responded to Fowler on December 19, 1997 with another "reservation of rights" letter asserting no coverage under the policy and the applicability of several exclusions. In addition, Lumber noted that there was no duty to defend as there was no underlying lawsuit against PWP or Fowler. *Id.*, Ex. C. On December 30, 1997, counsel for NAS wrote a letter to Nichols Claims Service, the independent adjuster retained by Lumber to investigate the defective cabinetry and millwork claims, and requested that Lumber respond with its position on the pending claims. *Id.*, Ex. D. On December 31, 1997, Lumber responded in writing, again asserting no coverage under the policy and the applicability of several exclusions, and attached a copy of a previous "reservation of rights" letter. *Id.*, Ex. E.

In 1998, after extensive negotiations, the parties agreed that the sum of $1.4 million

**2.** Although not relevant to this litigation, Lumber also took the position that ARMC's losses were excluded under the terms of similar exclusions in the umbrella policy it issued to PWP.

would be paid to ARMC by NAS and St. Paul Insurance Company ("St.Paul"), the CGL insurer of Fowler, in satisfaction of all claims by ARMC arising out of PWP's defective work. (Currin Aff. ¶ 6, Ex. B.) Lumber continued to take the position that there was no coverage under the CGL policy it issued to PWP and Fowler and refused to contribute to the settlement amount. *Id.,* Ex. B. NAS agreed to pay $893,257.65, which represented the penal sum of its performance bond less its investigatory costs, and St. Paul agreed to pay $506,742.35. These payments were made in May 1998, and a settlement agreement and release was executed by all parties to the dispute except Lumber. *Id.* ¶ 6, Ex. B. In the initial recitations in the settlement agreement, ARMC expressly acknowledged that its claims against the parties would include "significant damage to other portions of the Project in the hospital" and business disruption (loss of use) damages. *Id.,* Ex. B at 2. In the release portions of the settlement agreement, ARMC expressly released the parties from any liability for bodily injury, consequential damages or loss of use damages. As part of the settlement, NAS was assigned the rights of St. Paul and Fowler and now asserts them in this action against Lumber. *Id.,* Ex. B.

In late 1999, ARMC began utilizing the settlement proceeds to replace the defective cabinets and millwork. (Currin Aff. ¶¶ 7, 8.) As of the time the instant cross-motions for summary judgment were filed in March 2002, the vast majority of the replacement work had been completed at a cost of approximately $1.42 million. *Id.* ¶ 8, Ex. C.

### III. Summary Judgment Standard of Review

The summary judgment standard of review under Rule 56 of the Federal Rules of Civil Procedure is well established. A party is entitled to judgment as a matter of law upon a showing that "there is no genuine issue as to any material fact." Fed. R.Civ.P. 56(c). The material facts are those identified by controlling law as essential elements of claims asserted by the parties. A genuine issue as to such facts exists if the evidence forecast is sufficient for a reasonable trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating a forecast of evidence on summary judgment review, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

When the moving party has carried its burden, the nonmoving party must come forward with evidence showing more than some "metaphysical doubt" that genuine and material factual issues exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987). A mere scintilla of evidence is insufficient to circumvent summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. *Id.* at 248–49, 106 S.Ct. 2505. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1315–16 (4th Cir.1993).

## IV. Discussion

### A. *Choice of Law*

■ As a threshold matter, the parties dispute which state's law should apply to the Court's interpretation of the insurance policy at issue in this case. Plaintiff NAS maintains that the law of North Carolina should apply, citing *Collins & Aikman Corp. v. Hartford Accident & Indem. Co.*, 335 N.C. 91, 436 S.E.2d 243, 245 (1993) and section 58–3–1 of the North Carolina General Statutes.[3] Defendant Lumber contends that the law of South Carolina should apply, citing the principle of *lex loci contractus, Fortune Ins. Co. v. Owens*, 351 N.C. 424, 526 S.E.2d 463 (2000) and *Roomy v. Allstate Ins. Co.*, 256 N.C. 318, 123 S.E.2d 817 (1962).

The Court finds that the law of South Carolina should properly be applied to interpret the CGL policy at issue in this case. A federal district court sitting in diversity must apply the choice of law rules of forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In deciding which law should govern interpretation of a contract, North Carolina follows the principle of *lex loci contractus*, which provides that the law of the state where the last act occurred to form a binding contract should apply. *Fortune Ins. Co.*, 351 N.C. at 428, 526 S.E.2d at 465–66; *Roomy*, 256 N.C. at 322, 123 S.E.2d at 820. Here, the last act to form the binding contract of insurance was Lumber's delivery of the CGL policy to PWP at its corporate headquarters in Greenville, South Carolina, *see* Gyscek Aff. ¶ 2, which would indicate that the law of South Carolina should apply.

NAS asserts that *Collins & Aikman* interprets section 58–3–1 to provide an exception to the rule of *lex loci contractus* where the "interests" being insured have a significant connection to North Carolina. However, the Court finds *Collins & Aikman* inapposite to the facts of this case. The *Collins & Aikman* case involved an insurance policy, delivered to the insured in California, on a fleet of commercial vehicles, 97 of 102 of which were titled in North Carolina. In addition, the insured's transportation division was located in North Carolina. 335 N.C. at 92, 436 S.E.2d at 244. The North Carolina Supreme Court found that due to the significant interests being insured in North Carolina, North Carolina law should apply. *Id.* at 95, 436 S.E.2d at 246.

In contrast, in the case at bar, there is no evidence that the CGL policy issued to PWP insures significant real property or any commercial vehicles titled in North Carolina. Rather, the policy covers the acts and omissions of PWP and its agents anywhere in the coverage territory, which includes the United States and Canada, and potentially "all parts of the world" if the injury or damage arises out of goods or products made or sold by PWP. (Gyscek Aff., Ex. A, CGL policy, § V, definition 4.) The only connection to North Carolina in this case is the happenstance that PWP's defective cabinetry and millwork was installed in a hospital in North Carolina. The North Carolina courts have explicitly held that where the fortuity of an accident within the state is the only connection to the state, that is not sufficient to make North Carolina's law applicable. *Fortune*, 351 N.C. at 428, 526 S.E.2d at 466 ("[T]he mere presence of the insured interests in

---

**3.** Section 58–3–1 of the North Carolina General Statutes provides as follows: "All contracts of insurance on property, lives, or interests in this State shall be deemed to be made therein, and all contracts of insurance the applications for which are taken within the State shall be deemed to have been made within this State and are subject to the laws thereof." N.C. Gen.Stat. § 58–3–1(2002).

this State at the time of an accident does not constitute a sufficient connection to warrant application of North Carolina law.") The Court further notes that counsel for NAS essentially conceded at oral argument that the law of South Carolina applies to this case.

B. *Defendant Lumber's Motion for Summary Judgment*

Defendant Lumber moves the Court for summary judgment on the grounds that (1) the damages alleged by ARMC do not constitute "property damage" under the terms of the CGL policy; (2) the damages alleged by ARMC were occasioned by PWP's defective workmanship and thus were not caused by an "occurrence" as required by the CGL policy; and (3) even if the Court finds that the damages in question trigger coverage, numerous exclusions in the CGL policy apply to exclude such coverage. For the reasons that follow, the Court finds merit to Lumber's second argument and does not reach Lumber's remaining arguments.

■ The Court begins its analysis by noting that the law of South Carolina is clear that damages for repair or replacement of faulty or defective workmanship *standing alone* are not covered under the terms of standard CGL policies. *L–J, Inc. v. Bituminous Fire & Marine Ins. Co.,* 350 S.C. 549, 556, 567 S.E.2d 489, 493 (2002), *cert. granted* (2003); *Isle of Palms Pest Control Co. v. Monticello Ins. Co.,* 319 S.C. 12, 16–17, 459 S.E.2d 318, 320 (1994); *Nautilus Ins. Co. v. Long,* 315 S.C. 79, 81, 431 S.E.2d 624, 625 (1993); *C.D. Walters Constr. Co. v. Fireman's Ins. Co.,* 281 S.C. 593, 596–97, 316 S.E.2d 709, 711–12 (1984); *Stroup Sheet Metal Works, Inc. v. Aetna Cas. & Sur. Co.,* 268 S.C. 203, 213, 232

S.E.2d 885, 888 (1977). The coverage section of the CGL policy in this case provides that the "insurance applies to ... 'property damage' only if ... [t]he ... 'property damage' is caused by an 'occurrence' ...." (Gyscek Aff., Ex. A, CGL policy, § I.A.1.b(1).) An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.,* § V, definition 12. The South Carolina courts have adopted the following definition of the word "accident": "An effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and cannot be charged with the design of producing ...." *Ducker v. Central Sur. & Ins. Corp.,* 234 S.C. 228, 230–31, 107 S.E.2d 342, 343 (1959).[4]

Here, PWP's defective cabinetry and millwork do not amount to an "accident," because defective workmanship is a business risk "reasonably anticipated" by PWP. As explained by the Supreme Court of South Carolina:

> The insured-contractor can take pains to control the quality of the goods and services supplied. At the same time he undertakes the risk that he may fail in this endeavor and thereby incur contractual liability whether express or implied. The consequence of not performing well is part of every business venture; the replacement or repair of faulty goods and works is a business expense, to be borne by the insured-contractor in order to satisfy customers.

*C.D. Walters Constr. Co.,* 281 S.C. at 596, 316 S.E.2d at 711 (quoting *Weedo v. Stone–E–Brick, Inc.,* 81 N.J. 233, 239, 405

---

4. The North Carolina Supreme Court has defined "accident" as an "an unforeseen event,... an unexpected, unusual, or undesigned occurrence; the effect of an unknown cause, or, the cause being known, an unprecedented consequence of it ...." *Tayloe v. Hartford Accident & Indem. Co.,* 257 N.C. 626, 627, 127 S.E.2d 238, 239–40 (1962).

A.2d 788, 791 (1979)) (citations omitted). Thus, a contractor's failure to conform its work product to contract specifications is properly remedied by performance bonds, not CGL policies. *Wm. C. Vick Constr. Co. v. Pennsylvania Nat'l Mut. Cas. Ins. Co.,* 52 F.Supp.2d 569, 591 (E.D.N.C. 1999)(" 'To hold that a CGL policy is the effective equivalent of a performance bond would cause injustice to the CGL insurer who, unlike the surety on a performance bond, has no recourse against a contractor for the use of defective materials or poor workmanship.' ") (citations omitted); *Western World Ins. Co. v. Carrington,* 90 N.C.App. 520, 523, 369 S.E.2d 128, 130 (1988)("[L]iability insurance generally does not provide coverage for claims arising out of the failure of the insured's product or work to meet the quality or specifications for which the insured may be liable as a matter of contract.... [L]iability insurance policies are not intended to be performance bonds.") (citations omitted). In addition, the Court notes that counsel for NAS effectively conceded at oral argument that damages for faulty workmanship standing alone would not be covered by the CGL policy.

█ However, the Court's analysis does not end here. There remains an issue whether ARMC experienced *other* damages as a result of PWP's defective cabinetry and millwork that would trigger coverage under the CGL policy. This requires closer analysis. The evidence before the Court reveals that prior to the commencement of the repair and replacement effort, ARMC acknowledged and agreed in the settlement agreement that PWP's defective cabinetry and millwork would cause "significant damage to other portions of the Project in the hospital, including but not limited to sheet rock, painting, wallpaper, floor covering, plumbing and fixtures, and wiring and electrical work" and "would result in a disruption of its business, thereby causing it substantial economic loss." (Currin Aff., Ex. B at 2.) ARMC included these damages in the $1.4 million settlement amount and released the parties from any further liability for such damages. *Id.* at 3–6. It is this anticipatory stance that counsel for NAS urges the Court to focus on in determining whether the damages in question should be covered by the CGL policy. Because *some* of the damages anticipated and released by ARMC in the settlement agreement could be covered damages, e.g., business disruption or "loss of use" damages, NAS maintains it is Lumber's burden to demonstrate the proper apportionment of covered and non-covered damages in the $1.4 million settlement sum. NAS argues that Lumber's CGL policy fails to address the proper apportionment, and that therefore, the CGL policy should be construed against Lumber. Further, because Lumber has failed to demonstrate to the Court the proper apportionment of the damages through any other method, NAS maintains that the entire $1.4 million sum paid to ARMC should be deemed covered by the CGL policy and recoverable by NAS.[5]

On the other hand, after most of the repair and replacement effort had been completed, Lumber obtained and submitted to the Court an affidavit from John G. Currin, Jr., Executive Vice President for Administration at ARMC and the primary person in charge of the repair and replacement effort. Currin averred that ARMC

---

5. The Court notes that neither party cited to the Court any authority regarding how it should proceed where an underlying dispute involving both covered and non-covered damages is settled by a written agreement containing no apportionment of the damages. The Court does note, however, that counsel for NAS conceded at oral argument that the non-covered costs of repair and replacement of PWP's work would account for at least $982,300 of the $1.4 million settlement amount.

did *not* in fact experience any bodily injury damage or "collateral property damage" during the repair and replacement of PWP's defective workmanship. (Currin Aff. ¶¶ 9, 10.) Currin did not expressly deny that ARMC experienced any "loss of use" damages, but did aver that "the *only* action required by the hospital to date to remedy this problem has been the removal of the initial set of defective cabinetry and millwork and the installation of new cabinets and millwork . . . ." *Id.* ¶ 10 (emphasis added).

When pressed at oral argument, counsel for Lumber conceded that ARMC incurred minor damages for repair of drywall, repainting of walls and removal and reinstallation of sinks incident to the replacement of PWP's defective cabinetry and millwork. However, Lumber took the position that such damages were not "collateral damages" triggering coverage,[6] but rather, were incident to, and a foreseeable consequence of, the repair and replacement effort. Because such damages were foreseeable, Lumber argues, they were not occasioned by an "occurrence" and were not covered under the express terms of the CGL policy.

After due consideration of the parties' arguments, the Court finds that there has been no "occurrence" giving rise to "property damage" and thus no coverage under the CGL policy. As stated above, the costs of repair and replacement of PWP's defective cabinetry and millwork, standing alone, are foreseeable by PWP and thus, not caused by an "occurrence" and not covered by the CGL policy. Similarly, the Court finds that the costs incurred by ARMC to repair drywall, repaint walls and reinstall sinks, wiring and plumbing inci-

dent to the replacement of PWP's defective workmanship are the foreseeable consequences of the replacement of defective work. As these costs are foreseeable by PWP, they are not an "accident" and thus, not caused by an "occurrence," resulting in no coverage under the CGL policy. *Wm. C. Vick Constr. Co.,* 52 F.Supp.2d at 585–86 ("If . . . Farm Bureau sued Vick Construction for damages caused to office furniture due to leaks in the newly constructed building addition, or if faulty construction caused the ceiling to collapse thereby causing injury to a person standing inside the new addition, such an event may very well constitute an "accident" triggering coverage . . . ."); *Reliance Ins. Co. v. Mogavero,* 640 F.Supp. 84, 86 (D.Md.1986)(" '[O]ccurrence' does not include the normal, expected consequences of poor workmanship."); *compare Indiana Ins. Co. v. Hydra Corp.,* 245 Ill.App.3d 926, 185 Ill.Dec. 775, 615 N.E.2d 70 (1993)(no CGL coverage where damages including cracks in the floor and loose paint were directly tied to the defective workmanship) *with Kalchthaler v. Keller Constr. Co.,* 224 Wis.2d 387, 591 N.W.2d 169 (1999)(CGL coverage where leaky windows damaged drapery and wallpaper and thus damages extended beyond scope of contractor's original work).

In regard to bodily injury and loss of use damages, there has been no affirmative showing by NAS that ARMC in fact incurred such damages. While the anticipatory settlement agreement acknowledged that such damages could occur and included such damages in the settlement amount and releases, this anticipatory showing is defeated by Currin's affidavit, which avers that such damages were not in

---

**6.** At oral argument, counsel for Lumber opined that if one of PWP's defective drawers or countertops had fallen and crushed an x-ray machine, that would not have been foreseeable by PWP and thus would have consti-

tuted an "occurrence" triggering coverage. Counsel for Lumber maintained that no such damages were in fact experienced by ARMC during the replacement effort.

fact incurred by ARMC. Despite its opportunity for full discovery in this case, NAS has failed to make any showing, either through affidavits, depositions or documents, that Currin's statement regarding the actual incidence of damages to ARMC is not factually correct. Accordingly, the Court finds that none of the damages incurred by ARMC triggered coverage under Lumber's CGL policy, and that there are no genuine issues of material fact remaining to be tried by the Court. In light of this holding, the Court does not reach the issues of whether there was "property damage" as defined by the CGL policy or whether any of the policy's exclusions apply.

### V. Conclusion

For the reasons stated above, **IT IS HEREBY ORDERED** that Plaintiff NAS' motion for summary judgment (Pleading No. 25) be **DENIED**, that Defendant Lumber's motion for summary judgment (Pleading No. 30) be **GRANTED.**

Further, with regard to the matter referenced in Footnote 1 above, **IT IS ORDERED** that NAS shall have within 30 days of this Memorandum Opinion to file a motion for a default judgment against PWP, failing which such claim shall be dismissed without prejudice for failure to prosecute.